## Robert S. Adams, Admr., *v.* Titus C. Westbrook.

1. Executors and administrators: conclusiveness of annual accounts.—Where the annual account of an executor, administrator, or guardian, states the balance against him in dollars and cents, he will be concluded thereby, and will not be permitted to show that the amount was, at the time, invested in solvent notes.

2. Same: duty of, to report condition of estate, change of assets, and sanction of court for his acts.—It is the duty of executors, administrators and guardians, to faithfully and accurately report to the court all their actings and doings, the condition of the estate, and the increase and change in the property and assets, and to obtain the sanction of the court for all their acts.

3. Same: responsibility for failure to make proper reports.— Executors, administrators, and guardians become personally responsible when they fail to make such reports as will enable the court and the parties interested to ascertain and identify what debts or claims belong to the estate, or when they choose to charge themselves individually with money, or choses in action, or mingle the same with their individual money or claims, or so manage it as to render it impossible for the court or the parties interested to distinguish the estate in their hands from their own.

4. Guardian: commissions.—When the conduct of the guardian, in the management of his ward's estate, is just and fair, the allowance of commissions should be liberal.

Error to the Probate Court of Lowndes county. Hon. William H. Sims, judge.

Wyatt Moye was the executor of the last will and testament of Moses Westbrook. The will directed that the estate, real and personal, be sold by the executor, and the proceeds equally divided amongst the three sons of testator, Charles, Titus, and Moses. Wyatt Moye was appointed their testamentary guardian. After the estate of Moses Westbrook was finally settled Moye qualified as guardian. The guardianship of Charles was finally settled in 1859.

Moye qualified as guardian of Titus Westbrook in 1856. He accounted regularly with the Probate Court until 1861. He removed from the State of Mississippi. in 1861, and died in Lousiana in 1862.

Robert S. Adams was appointed administrator of Moye in 1865, and in 1866 Titus Westbrook filed his petition in the court below to compel Adams to make final settlement of the guardianship of Moye. The petition states the appointment of Moye as guardian, makes his annual accounts, exhibits, and insists that he is debtor for the balance stated in his last annual account, with compound interest at ten per cent. per annum. That Moye used the money of petitioner in his own business, kept no separate account of it, and speculated on it, and that he is entitled to the highest rate of interest with annual rests. That Adams refuses to pay, but insists that he shall take certain notes payable to Moye as guardian, drawing ten per cent. interest, and which petitioner believes are of doubtful solvency, and is unwilling to accept. That he has accepted notes amounting to some $18,000, and $7,000 of which had been paid to Moye in his lifetime, and which he tenders back, and insists that he shall not be charged with the same.

The answer of Adams admits the appointment of Moye as guardian, the annual accounts, but insists that he is not debtor to Titus Westbrook for the balance stated in his last annual return, but that petitioner should be compelled to receive in settlement certain guardian notes which he has in possession, and tenders with his answer : That these notes were solvent when taken, that the money of Titus was invested in the same, that some of the notes are now good, others entirely worthless. Denies that Moye used the money of petitioner in his own business, or that he speculated on the same, and states that he kept the same separate, and that he mingled that of Titus and Moses (another of his wards) because he received it as a joint fund. Admits the receipt of the notes by petitioner, and insists that he shall be charged with those which he alleges were paid. That the estate of petitioner consisted in part of a one-half interest in the note of M. J. Wicks, R. D. Rhodes, and John Wicks, amounting to $30,000 ; that the other half belonged to his brother Charles, and was collected and paid to him in 1859. That in 1862, petitioner having reached his majority, it was agreed between him and his guardian to meet in New Orleans

for a settlement. That to put himself in funds, Moye collected the balance due on the Wicks note, amounting to $17,500, which was paid by a check on New Orleans, that was collected by the agent of Moye in Confederate money. That petitioner did not come to New Orleans as he had agreed; that the money remained in the hands of Moye's ·agent until it became worthless or nearly so, and insists that petitioner should bear the loss. Files his final account with his answer, and after stating the balance against him (the amount reported in the account of 1861 with 8 per cent. interest), he charges petitioner with $17,500 Confederate money, collected on the Wicks note, with $13,300 due in guardian notes, and the balance of $4,600 in cash.

Defendant in error introduced the following testimony:

Letter from Wyatt Moye showing that $7,500 of the notes transferred by Adam to Titus Westbrook had been paid to Moye.

C. R. Jordan testified: That he and others as his security executed to Moye their note, that it was given for the purchase of certain slaves, the property of Moye. The note was payable to Moye as the guardian of the Westbrook heirs.

Reuben Davis testified: That he gave to Moye his note with Acker & Rogers as security. That the consideration was for money loaned and slaves sold by Moye to him. The note was made payable to Moye as the guardian of the Westbrook heirs. ·
That the note was good at the time it was given, and is now.

James Burnett testified: That he and Green, and Willis Burnett, gave their two notes to Moye, one for money loaned and one for slaves. That the notes had been paid. Do not know whether they were payable to Moye as guardian.

M. J. Wicks: That the note of himself and others was given Gen. Moye as administrator, for the loan of certain bills given by the purchasers of property at the estate sale of Moses Westbrook. That the note was finally paid in March, 1862, by his check on the Bank of Memphis, and remitted to New Orleans by check of Bank of Memphis on one of the New Orleans banks. That at the time the payment was made, the New

Orleans banks had suspended specie payments, and were paying generally in Confederate treasury notes.

It was then shown by certain trust deeds and judgments, that Thomas Coopwood, one of the makers of the notes with which defendant in error was sought to be credited, was in embarrassed circumstances at the time the notes were given.

The first annual account of Moye, as guardian of Titus, was filed April, 1856. It is in substance as follows:

Balance due Ward, March 11, 1856. . $16,591 30

"This may certify, I have made out my guardian's return to April term, 1866, and I have transferred, as executor of Moses Westbrook, deceased, to me as guardian of Titus, the sum of $16,635.41, and after deducting amount of vouchers, leaves a balance due the ward of $16,591.30."

Second annual account, April, 1857.

| | |
|---|---|
| Dr.—To balance as per return of 1856 . | $16,591 50 |
| " Int. on same for 12 months. . | 1,327 32 |
| | $17,918 82 |
| Cr.—By sundry vouchers . . . | 1,373 50 |

This amount due him 11th March, 1857. . $16,545 32

"On the 11th March, 1857, there is due my ward $16,545.32, this amount is in solvent guardian notes drawing eight per cent. interest," and then follows an explanation as to the amount of the disbursements.

Third annual account, April, 1858.

| | |
|---|---|
| Dr.—To amount of return for 1857 . . | $16,545 00 |
| " Int. 12 months 8 per cent. . . | 1,323 60 |
| | $17,868 60 |
| Cr.—By sundry vouchers . . . | 602 08 |

Amount due ward 11th March, 1858 . $17,266 52

"The amount in my hands is secured by guardian notes drawing interest."

Adams, Admr., *v.* Westbrook.

Fourth annual account, June, 1859.
Dr.—To this amount of return for 1858    .    $17,266 52
    " 8 per cent. to 11th March, 1858       1,381 32

                                                 $18,647 84
Cr.—By sundry vouchers    .      .      .           415 19

Amount due him 11th March, 1859      .     $18,232 65
"I find I owe him (ward) on the 11th of March, 1859, $18,232.65, as the above stated account shows."

Fifth annual account April, 1860.
Dr.—To amount of return, June, 1859    .    $18,232 65
    " Int. 8 per cent. for 12 months to 11th
         of March, 1860      .      .      .        1,458 61
    " decree in his favor by court in Lowndes
         county   .      .      .      .      .        6,843 22
    " Int. on decree, 3 months and 4 days,
         8 per cent      .      .      .      .          141 94

                                            $26,676 42
Cr.—By amount of sundry vouchers      .          497 84

Due the heir 11th March, 1860      .     $26,178 58
" On the 11th March, 1860, I owe the said Titus $26,178 58, as the above account represents."

Sixth annual account, April, 1861.
Dr.—To amount return of 1860      .      .    $26,178 58
    " Int. 8 per cent. 12 mos. March 11, 1861    2,094 28

                                            $28,272 86
Cr.—By sundry vouchers      .      .      .           51 14

                                            $28,221 72

"I owe my ward on 11th March, 1861, $28,221.72, as the above exhibits."
All of these accounts were allowed.

Testimony for plaintiff in error:

Letter of T. C. Westbrook to Wyatt Moye, dated April, 1862, in which he acknowledges receipt of letter from Moye, tells him he will leave Texas in a few days to join the army at Shiloh; that L. W. Carr will be out in a short time, and settle with him.

Copy of receipt of T. C. Westbrook to Adams for the notes mentioned in the answer of Adams.

M. J. Wicks: That he paid balance due on his note to Moye in March, 1862; it was paid by check on Bank of Memphis, and amount remitted by check of Bank of Memphis on one of New Orleans banks, to Tarleton, Whiting & Tullis, New Orleans; the check was paid in Confederate money; heard General Moye say, early in 1862, that he wanted this money in New Orleans to enable him to settle with one of the Westbrook heirs.

W. C. McClure: That the amount paid by Wicks to Moye was remitted by direction of the latter to New Orleans; that the check was paid in Confederate money.

W. B. Tullis: Received remittance from Bank of Memphis, and collected same in Confederate treasury notes; heard General Moye say he wanted this money to settle with one of his wards in Texas; the Confederate money remained in my hands until after the surrender of the city of New Orleans, when I invested the same in Federal currency, realizing therefrom the sum of $10,570; two thousand five hundred and eighty dollars of the amount has been paid to the widow of General Moye, and the balance is to the credit of the estate on the books of Tarleton, Whiting & Tullis.

Spratt, Williams, Randle and Barker testified that the notes payable to Moye, as guardian, were good at the time they were given, and that a prudent man in the management of his own business would have loaned the amount of money to the makers of the notes; that a few of the notes were now good, the most of them worthless.

Barker: That the notes given by himself and others were for loaned money, and General Moye told him at the time of the loan, that it was the money of the Westbrook heirs.

Love: That he was a witness to the three notes given by

Young and Sarter. That they were given for the loan of money, and General Moye said, at the time of the loan, that it was money that belonged to his wards, the Westbrook heirs.

Adams : That the Coopwood notes were given for money, which General Moye said belonged to the heirs of Westbrook.

That General Moye did not use the money of the Westbrook heirs in his own business ; that he was a dealer in money, and always had a large surplus of his own to use.

That he does not know that he kept a separate account of the money of his wards.

That the notes, which are offered in testimony, he found amongst the papers of General Moye, separate from his other notes, and marked guardian notes of Titus and Moses Westbrook.

Notes of the following description were offered in evidence :

Made by J. C. Sarter, G. W. Sarter, and Thomas Young, on 3d December, 1861, and due at 12 months to Wyatt Moye, guardian of Titus and Moses Westbrook, heirs of Moses Westbrook, deceased, for $1,290.80. Interest at 10 per cent., payable annually.

Note of T. B. Coopwood, T. Coopwood, and D. Clarke, of 18th October, 1858, due to Wyatt Moye, guardian of the minor heirs of Moses Westbrook, deceased, for $933.09. Interest at 10 per cent., payable annually.

Note of T. and W. C. and T. B. Coopwood, of 16th March, 1861, due at 12 months to Moye, guardian to the minor heirs of Moses Westbrook, deceased, for $4,313.11. Interest at 10 per cent., payable annually.

Note of same parties, made 23d October, 1858, due as above, and with the same rate of interest, for $5,328.34.

And a number of other notes, payable to Moye as guardian of Titus and Moses Westbrook.

The court below decreed that plaintiff in error should pay the amount of the balance reported in the annual account of 1861, with interest at eight per cent. per annum ; that the amount received by defendant in error in notes, excepting those which had been paid to Moye in his lifetime, should be credited

at the time received, and that no commissions be allowed to the intestate of plaintiff in error.

From this decree plaintiff in error prosecutes this writ of error.

*Houston* v. *Reynolds* for appellants.

In this case the two main points are:

1st. Is Westbrook bound to receive the *notes* tendered by the guardian's administrator, as a part of the ward's estate? and

2d. Is he bound to receive the Confederate money collected on the "Wicks" note?

On the first point, counsel contend that Moye, in his 4th and subsequent annual accounts, having acknowledged himself indebted to his wards, his administrator is estopped from denying said indebtedness. But this construction we deny. His account is made out between Moye as guardian, and his wards, and the indebtedness is therefore by him as guardian. He is indeed his ward's debtor, having received his money, 29 Miss. 266; but is he such a debtor that he is bound to pay the debt out of his private funds? In 29 Miss. 266, above cited, the court meant he might discharge the debt by showing good faith and ordinary diligence had been used in investing the funds. In the 1st item of his account to June term, 1859, he means to charge himself with the usual "balance on last account," which balance is stated to be "amount on hand secured by guardian notes," $17,256.52, only meaning to charge himself with these notes, and so on through all the accounts. But admit the language to be ambiguous; the extraneous fact that one of these bonds (the Wicks and Rhodes bond) had been reported from the first as an investment of his ward's money together with various others, amounting to near $25,000, which were held by him and unpaid then and at the date of the subsequent annual accounts, proves that he could not have meant to charge himself *personally* with the amounts of those notes.

But even admitting counsel to be correct, still it is a case of plain error which recent decisions allow to be corrected by the Probate Court. *Effinger* v. *Richards*, 35 Miss. 549; Probate

Court Law and Practice, 332–3 ; 9 Peck, 26, 27, 28, 29 ; Rev. Code, page 431, § 33; *Crump* v. *Gerrick*, 40 Miss. R. 765.

II. Persons acting in a fiduciary capacity are presumed to have done their duty until the contrary be shown. Hill Trustees, top pp. 254–5 ; 24 Miss. 533 ; Story Bail. § 213 ; 11 Wend. 25 ; *Williams* v. *East India Co.*, 3 East, 192 ; and Moye will be held to have taken these notes for the identical money of his wards, until the contrary be shown.

Counsel claim that the testimony of Jordan and Davis show these notes were not given for ward's money loaned, but for negroes sold by Moye ; but circumstances go far to show Davis was mistaken ; and Jordan's note not being in issue here, his testimony was not competent to establish any fact connected with the notes which *are* in controversy. But opposed to these two witnesses, we have various persons testifying that several of the notes were for wards' *money ;* showing that the parties to the notes were, at the dates thereof, good and solvent, and that consequently no reason for falsely reporting these notes, more than any others, as the wards' ; showing that Moye had always money enough of his own for his own purposes ; showing the parties were all money borrowers and did borrow money from Moye, which was as likely the wards' money as his own ; and lastly, except Davis and Jordan, not showing that any of the parties ever bought property from Moye.

We deem the evidence of Barker and Love competent to show the notes of Barker and Sarter and Young were for wards' money. It is a part of the *res gestæ.* 1 Greenl. § 97 ; ib. 108–9–10; Story Bail. § 339 ; 24 Miss. 528, 534–5 : 7 Peters, 99 ; 1 ib. 51 ; 14 S. & Rawle, 275.

If these notes then were for wards' money, the wards are bound to receive them unless they can show :

1st, that an order of court was necessary before lending, or 2d, that Moye did not loan it in good faith and with that caution and prudence a prudent man would use in his own affairs.

And 1st, the language of the statute, Rev. Code p. 462,

§ 147, is that the court "may direct " (not "shall empower" or "authorize") the loan, clearly signifying the guardian has the power without any order of court; but in case he fails to exercise that power for his wards' benefit, the court may interpose and compel him to do so.

The statute differs entirely from that authorizing investment of wards' funds in land or slaves. In that case authority must be obtained from the court, and his acts must be approved afterwards. Hutch. Code, 678, § 13. And in the present Code the bonds taken for wards' money loaned need not be approved by the court, as was required in Hutch. Code.

In case of *Walker* v. *Reynolds*, 29 Miss. 262, cited by counsel, the question here at issue was not before the court for decision (as was then admitted), and we are not bound to notice any opinions on the subject there stated. *Pass* v. *McRae & Coffman*, 36 Miss. 147-8.

And, 2d, as to the exercise by Moye, of good faith and such prudence and caution as guardians are bound to exercise : "They may compound debts, enter into arbitrations, &c., and their acts will be upheld if they appear to have been done for the benefit of the minors, and to be free from fraud, negligence, or misconduct." *Berry* v. *Parkes*, 3 S. & M. 639; *Baily* v. *Dilworth*, 10 S. & M. 404; *Smyth* v. *Burns*, 25 Miss. 427; 9 Pick. 461; 2 Wheat. 42; 1 Atk. 514.

Executors, administrators, and guardians are treated in law and equity as trustees, and also stand in the condition of bailees. Toller Exrs. p. 80, note B; ib. 133 C; 1 *Gill* v. *Johnson*, 270-4; Ambler, 219; 5 Vesey, 843 ; 1 Maddox Ch'y. 114; 2 Lomax Exrs. 229 § 9; *Baily* v *Dilworth*, *ut supra*.

Bailees for reward must use ordinary diligence, and are responsible for ordinary neglect. Story Bail. § 23 § 429 ; 2 Lord Raym. 919. As to what constitutes ordinary diligence, see Story Bail. § 11; Jones Bail. § 6; 14 Serg. & Rawle, 275; 3 Bing. N. C. 468. It is chiefly a matter of fact, and may differ in different times and places. Story Bail. §§ 11, 12, 13; 3 Bing. N. C. 468-475; 4 Barn. & Ald. 21, 30.

Now if, at the date of these notes, prudent men loaned these

men money, and regarded them as good for such sums, then Moye will be held to have exercised the "ordinary diligence" required to protect him. The testimony shows all this, and that the parties were all good and solvent at the time Moye loaned them his wards' money.

The next question is, are the wards bound to receive the value of the Confederate money received by Moye from Wicks, April 8, 1862?

The act of August 2, 1861, Acts pp. 38, 39, authorizes guardians to receive or invest in C. S bonds or treasury notes.

The act of November, 1865, Acts, p. 143, § 4, provides that the wards shall recover *the value* of these bonds or notes. We doubt not the general rule of law would protect Moye, even had these laws never been passed, in receiving the depreciated currency (*Berry* v. *Parkes* and *Baily* v. *Dilworth*, ut supra); for it certainly appears he acted for the best interests of his wards, and in good faith and with ordinary prudence, at the time. The investment was then on all hands considered the best that could be made; and shall Moye now be made to suffer for what was then a prudent and beneficial act? But the act of 1861, and that of 1865 ratifying it, completely exonerates him. Confederate treasury notes were the common currency of the country, and could be received though not a legal tender. *Green* v. *Sizer*, 40 Miss.; *Baily* v. *Dilworth*, ut supra; *Watson* v. *Stone*, MS. opinion Sup. Court, Ala., p. 18, § 2. A guardian is not bound to collect in gold and silver. *Berry* v. *Parkes* and *Baily* v. *Dilworth*, ut supra.

But it is said these laws were passed by rebellious legislatures, and are void. But so were the laws concerning Mississippi treasury notes, and the court has decided that *they* will pay debts. *Green* v. *Sizer*, ut supra. The Alabama Supreme Court have decided that guardians who invested their wards' money in this kind of currency are protected. *Watson* v. *Stone*, MS. opinion, pp. 3, 4. These laws cannot be objected to as involving the exercise of *judicial* powers. 3 S. & M. 715; 29 Miss. 149; Acts 1867, § 5; *Watson* v. *Stone*, Ala., ut supra; 16 Mass. 328, 330.

The legislature is the common guardian of all minors, etc., and may take care of their interests. 16 Mass. 328.

If I have failed in showing Moye to be exonerated from liability in regard to the Confederate States money, then the question of *rate of interest* comes up for discussion. It is contended that Moye's estate is liable for ten per cent. interest with "annual rests." But it has been decided by this court that a guardian is chargeable with that rate of interest compounded, only when he has been guilty of fraud and acted in bad faith. *Crump* v. *Gerrick*, 40 Miss. .

We think we have at least sufficiently established good faith.

*Christian & Sykes*, and *Harrison & Crusoe*, for appellee.

1. Guardian's annual account confirmed by the court is final and conclusive against him. 33 Miss. 553; 35 Miss. 540; 1 McCord, Ch'y Rep. 196; 1 Smith's Ch'y Pr. 273; *McFarland* v. *Randle*, opinion book.

In the present case the accounts for 1856–7–8 report amount due wards as secured by "guardian notes;" those for 1859–60–61 report each one entire sum of "money," viz.: $18,232.65, $26,178.58, and $28,221.72. The reports confirmed by the court are *conclusive*. The guardian having charged himself with the "money," and failing to show a proper use of *it*, is presumed to have used it himself, and is properly chargeable with compound interest. 35 Miss. 360–1; 1 Johns. Ch'y Rep. 620; 24 Miss. 410; 7 Yerg. 214; 2 Story Eq. Jur. § 1277.

2. Moye, though a first-rate business man, yet is proven to have entirely neglected his duties as guardian. He never obtained the sanction of the court to lend out or retain the money of his ward at interest, as required by law, and is therefore liable for any loss occurring therefrom. Rev. Code, p. 461, §§ 146, 147; 10 Maryland Rep. 440; 18 U. S. Dig. 376, § 30. Investment without authority is regarded as an appropriation to his own use. 31 Miss. 579, 596.

He took for money thus loaned other securities than *bonds* with security, as required by law. Rev. Code, 461, §147.

He made no annual report after 1861, thus showing negligence or fraud. 6 J. J. Marsh, 580 ; 7 ib. 230 ; 3 Monroe, 124.

He kept no books or accounts of his transactions, and hence every presumption of fact is *against* him. 32 Penn. State Rep. 495 ; 19 U. S. Dig. 675, § 99.

He left the country, his accounts unsettled, let his ward wander to Texas, and died in another State. Five years after, the ward has to hunt up an administrator for a settlement.

A guardian's rights and powers are strictly local. . The legal title to the property is not in him. 26 Miss. 70, 71 ; North Prob. 264, note. He must keep the trust fund distinct and separate, and is liable for losses resulting from mingling it with other funds. If he mixes it with his own he is liable for interest as having applied it to his own use, or as a trespasser. 2 Story Eq. § 12, 70 ; Hill Trustees, 376; Lewin on Trusts, 300, 328; 9 Humph. 614; 8 Gill & Johns. 218 ; 30 Penn. 536 ; 28 ib. 480 ; 9 Richardson Eq. Rep. 119 ; 8 Barb. Sup. Ct. Rep. 48, 53 ; 1 Paige, 402; 4 ib. 102; 1 Johns. Ch'y Rep. 620, 626-7-8 ; 2 ib. 62 ; 4 Barb. Sup. Ct. Rep. 626, 633, 637, 646 ; 7 Watts & Searg. 61.

Good faith, prudence, equal diligence, will not protect any trustee from the consequences of *unauthorized* acts. 4 Barb. 626, ut supra; 28 Penn. 480; 8 Barb. 431; 30 Penn. 536 ; 10 Barb. 61.

On 5th October, 1859, Moye, as executor of Moses Westbrook, deceased, reported near $50,000, proceeds of sale of land and slaves, and credited himself with that sum paid to guardian of the three minors. Not a dollar of cash was turned over, as stated, but only *notes !* A large note of Wicks's, his partner in banking, &c., was returned, as composing the entire estate of two of his wards ! No such note appears in his reports as Westbrook's executor ! The consideration of said note, it is proved, was *not* borrowed money, but only accepted bills on good houses in Mobile, running to maturity. And Moye, instead of dividing these bills among the wards, "share and share alike," as directed by Moses Westbrook's will, let Wicks take them and give *his* note, due March 1, 1857, more than two

years' credit (the bills being due March, 1855), suppressed this transaction from the court, and reported turning over so much " cash " to himself as guardian. These proceedings were unauthorized and a fraud on the wards.

When Charles A. Westbrook, coming of age, was paid off, January 10, 1859, only $12,000 had been paid on said Wicks's note, which, with compound interest, left a balance still due on it of $28,000 or more. Just afterwards, in March, 1859, Moye reported as due to Titus C. Westbrook, the alleged owner of one-half said note, in all only $18,232.65, leaving a surplus still due on said note of over $10,000, which he, Titus, could not possibly own. Moses, the youngest, never had any interest in said note. It is, therefore, certain that Moye personally was a party in interest also. The $12,000 paid on the note belonged one-half to Titus. It was *all* paid to Charles, thus showing $6,000 of one ward's money used in paying off another.

As the Wicks note constituted the *whole estate* of both wards up to the settlement with Charles, neither of them can have any interest in the other notes, due in 1856-7-8, now attempted to be palmed off on Titus Westbrook. These notes were all of date prior to said settlement, or given in renewal of others that were. It is proven that only two payments were made on Wicks's note, in 1859, after the $12,000 payment, viz., on November 17, and December 2. And yet several notes are reported payable to Moye, guardian, dated in 1859, before said last two payments on Wicks's note, and these, except four notes dated in 1861, are all the notes and obligations returned by Moye's administrator in his exhibit. It is then impossible that any of Titus's or Charles's money, as now alleged, could have been invested by Moye, in any of the claims returned. The fact is, both before and after his settlement with Charles, and before any money was on hand to invest, Moye used the title " guardian " &c., in making notes payable to himself, and none of said collections, payments, or notes, were ever reported to the court.

It is shown Moye considered himself his ward's debtor, by his reporting in his settlement with Charles, that he had paid him

up in full in cash. And afterwards, in his reports in case of Titus, for years 1859–60–61, he charges himself with the whole amount of indebtedness, and says nothing about any "guardian notes." Moye not only retained the legal title to the Wicks note *as executor*, but he never took *any* note to himself as guardian of any of the wards, or to any one of the wards themselves; but always, without authority or good reason, took them to himself as "guardian of the heirs of Westbrook," and there is no showing that he kept his wards' funds separate from each other or from his own.

We have seen he consolidated the entire estate of two of his wards into one note, took title to himself as "executor," and never, up to his settlement with Charles, did the trustee change the title or security. There is positive proof that many of the notes were taken by Moye, as "guardian of the heirs, &c.," for debts due to himself.

It is certainly illegal and fraudulent for a guardian to mingle and confuse the estates of his several wards, to pay off one, and make the others bear all the loss! This is what Moye has done.

In his annual report of April, 1860, he charges himself with so much *cash* due Titus, $6,843.22, decreed against him by Probate Court on final accounts as executor, December 7, 1859, and eight per cent. interest to March 11, 1860. He never reported or pretended that he had invested or loaned the money.

In 1860, only $4,290 was collected on Wicks's note, but on March 22, 1861, he collected $8,781.89 in par funds "to be credited January 5, 1862." This was not reported to court, nor has it ever been explained.

It is reported that the last payment on Wicks's note, $17,459.74, April 8, 1862, was in Confederate States money now in the hands of Moye's Louisiana administrator, and worthless. But this is not true. It was paid by check Bank of Memphis, remitted to Moye by draft on New Orleans, drawn in Confederate States money, invested in $10,570 United States treasury notes. Moye, it appears, wanted the money in New Orleans to settle with Titus Westbrook, then in Texas. This shows he treated the debt as *his own*, and was bound to pay it. Titus, in conversation with the administrator, stated that Moye had written

to him to come to New Orleans and he would pay him his money. He, Titus, could not go, but wrote the letter produced in evidence. This disproves any *agreement* to meet in New Orleans, &c., as alleged. No court would enforce such agreement between guardian and ward. 8 Penn. 533–4; 7 Watts & Searg. 48; 6 Dana, 204; 4 Serg. & Rawle, 112.

But it is proved Moye was not in New Orleans at the time agreed on. But he could only have settled with money, as there is not a note the legal title to which is in this ward. They are all payable to Moye, "guardian of Westbrook heirs," and are so mixed up and confused, that they went to Moye's administrator as assets, and the very claims returned as this ward's property are now being collected by suit, as the property of Moye's administrator!

It appears Moye never offered Charles Westbrook anything but *cash*, though many of these notes were then in existence. The reason is, the parties to the notes were good and solvent, and he could make a large annual profit out of them. If these notes were the ward's property, who succeeded to Charles Westbrook's interest in them? The interests were never severed, the money collected, or such claims reported to the court. They bore 10 per cent. interest, while the notes reported bore only 8 per cent. Taking these notes without consent of court, was a conversion of the fund by Moye for his own benefit, and *he* must bear the loss.

But admitting every position of the administrator, yet he had to assume "cash to balance $4,654.15 and $12,063.22, making $16,717.37. Where is this *cash?* In case of Moses there is deficit of $12,063.22, yet the record shows not one cent was ever paid to or for him! The guardian neglected his trust, and used the trust entirely for his own benefit.

The court very properly refused any commissions in addition to the immense profits fraudulently made out of the wards' estate. 36 Penn. 174; 35 ib. 245; 2 Stock. N. J. Rep. 268; 16 How. U. S. 535, 541, 542; 3 Story, 325; 5 Barr, 413; 2 Bland, 207; 1 Harr. & Gill, 11, 109; 4 Gill & Johns. 460; 2 Hen. & Munf. 420; 2 Dev. Eq. 137; 2 ib. 1; Chilton's Prob. Ch. Law,

356; 2 Lead. Cases Eq. 353; Hill Trustees, 867; 25 Miss. 226; 35 ib. 613; 13 S. & M. 307.

The only error in the decision of the court below was in appellant's favor in not allowing compound interest against him at 10 per cent., whereas only 8 per cent. was allowed, and that not compounded.

*Houston & Reynolds*, for appellants, in reply.

To the first point made by counsel for appellee, that Moye unlawfully loaned $30,000 to Wicks, as *executor*, we reply that in that case the remedy is against the *executor*, not the *guardian*.

Again, failure to return inventory within three months, though it is certainly the guardian's duty to so, does not make him personally liable for the wards' whole estate, any more than a probate judge's failing to hold court any one month would vitiate his acts as judge when he *did* hold court. In like manner, failure to render accounts every year, does not render the guardian personally liable for the wards' *whole estate*. Neither does failing to render accounts "under oath," as counsel contend.

Again, Moye *did* report his collections and investments up to 1861, and counsel are mistaken in stating the contrary. He died soon after, in 1862, and was before his death cut off from court. In citing 22 Penn. Reports, counsel omit to say that in Pennsylvania there is a special statute on the subject.

Again, counsel are mistaken in saying Moye did not lend on "bond with security." All the claims were " bonds with security," except Barker's, which had three responsible parties to it. But in fact there is no law requiring bond with security, except when the court has to direct the loan.

Again, we have yet to find the law making the guardian personally liable for not lending the ward's money in *Lowndes county*, and not notifying the court of his having loaned in Monroe.

Counsel contend that all of Charles's and Titus's money being invested in the Wicks note, on which nothing was collected until January 10, 1859, and Moses' money being invested in other notes not collected until after the war, consequently

Moye had no money of his wards' to invest in the Coopwood and Davis notes, made after March 11, 1856, and before January 10, 1859. But here he is again wrong. Moye's final account as executor, made in 1856, shows he had on hand $111,444.24. He paid to three wards $49,906.33; leaving $61,537.91. Of this he paid estate debts, $21,973.76, leaving on hand, as we make it, $39,564.15. Counsel *contra* make it $31,932.90, which admit as correct for sake of argument. To this may be added the money on the notes payable to Moses Westbrook, supposed to have been collected, not being now found, and invested in the notes on Carr, L. Westbrook, Burnett and Watson—amounting, principal and interest, to $20,960.16; which added to the $30,932.90, is $52,892.6, to say nothing of the interest on $31,932.90, being possibly invested in the Davis and Coopwood notes, etc. This shows how Moye, in doing as he did, might have acted in good faith and for his wards' benefit, and it is presumed, in absence of proof to the contrary, that he did so act.

Counsel are inconsistent in objecting to the collection of $20,000 on the Wicks note, and yet contending that Moye is liable for not collecting the whole of it sooner.

We are told that Moye, having in several accounts admitted his personal liability, is now estopped from denying it. We have expressed our opinion that he did not so admit; but if he did it was a *mistake*, which the court may correct in favor of the guardian. *Effinger* v. *Richards*, 35 Miss; *Crump* v. *Gerrick*, opinion book.

Counsel contended that, because in his settlement with Charles, he did not pay him out of collections on the Wicks note, but paid cash out of his own money, paying himself back afterwards out of collection on the Wicks note, this was such a mingling of his wards' means with his own, as to render him personally liable to Titus for his whole estate. But we cannot believe the law forbids a guardian to advance to his wards of his own funds and repay himself from their estate. Such a rule would be fatal to both guardian and ward.

We are told it was unlawful to send money to New Orleans

to pay Titus there ; that it should have been paid here. But Titus was of age, and wanted his money there. A receipt from him· *there* would certainly have been a good voucher for Moye *here*.

The stringent rule contended for, if carried out, would ruin the guardian while enriching the ward; will deter good men men from accepting guardianships, and thus throw them into the hands of the corrupt and dishonest.

HARRIS, J., delivered the opinion of the court.

These two cases, involving the same questions, are submitted to us together by consent of counsel.

Without attempting to review the whole record and testimony in these cases, it will be sufficient to say that they come within the decision of this court at the present term, in the case of *McFarland* v. *Randle*. Without imputing any corrupt or unlawful or wrongful act to the guardian, he may nevertheless be properly held as answerable to the defendant in error as his· *debtor*, under the facts appearing in this record. An administrator, executor, or guardian may undoubtedly avoid any personal responsibility in the conduct of the business of the estate committed to his care by faithfully and accurately reporting to the Probate Court all his actings and doings in relation thereto, and obtaining the sanction of the court. It is the duty of these officers to make proper exhibits and reports of the condition of the estates in their hands from time to time, so as to advise the court and all parties interested therein, of the income and the changes in the property and assets in their hands, and so as always to enable the court and the parties to identify and distinguish it as far as practicable. When this is done, the property and assets so reported and identified as the property of the estate they represent, will always be so held and treated, and the representative of such estate only held to the exercise of proper diligence in its management and preservation. But when, by the failure of the guardian, etc., to make such reports as will enable the court and all the parties in interest to ascertain or identify what debts or claims belong to the estate, or where the repre-

sentative chooses to charge himself individually with money and choses in action belonging to the estate he represents, or to mingle the same with his individual money or claims, or so to manage it as to render it impossible for the court or other parties to distinguish the estate in his hands from his own—in either case the representative becomes personally responsible, and cannot be permitted himself, at his election, to compel his ward, or the heirs of the estate he represents, to receive claims or assets never reported to the court as such, and never known to any one as such save himself.   The impolicy of such a course of administration, and the temptation to defraud estates by such a course, is too obvious to need further remark.

In the case before us, we think it obvious that the guardian intended to charge himself personally with the amount due his ward.   His conduct seems to have been fair and just.   He fully charges himself with all that the ward was entitled to, with interest thereon from year to year.   While, therefore, we think there was no error in the court below, in charging the estate of the guardian with the amount appearing to be due as ascertained by the court, we think the court erred in not allowing liberal commissions.

For this error let the judgment be reversed and cause remanded for a final decree in the court below, upon the basis of the former decree, except as to the allowance of commissions.

